Good morning, Your Honors. Jerry Fong on behalf of the appellants, commonly known as the Taylor Group. Your Honor, if I may reserve four minutes of my time for rebuttal. You can watch the clock and I'll also try to help you as well. Do you see the clock there? I do. All right. Most people see it and then they forget about it, so I will try to help you. No, I certainly appreciate any help that I can get. Your Honor, let me start out with what I see as a fundamental flaw on a very common sense level by the Bankruptcy Court. It seems to me... Are we reviewing the Bankruptcy Court or the BAP? Both, Your Honor. Well, Your Honor, I think, though, the BAP's decision to uphold the Bankruptcy Court is also flawed in that there was at any level, at any level until this Court, there has never been anybody asking, well, first, did the debtor, Megacy Power, ever have ownership or claim to have ownership or interest in the nonstationary application of the supercell technology? That question was never asked. But there was extensive, extensive discussion about the settlement agreement, the alleged assignment, what Mr. Taylor contended, and ultimately the Bankruptcy Court concluded that his statements were uncorroborated. And if I understand it correctly, the portion of the technology to which you make reference was included in what he claimed because he was including everything that the Taylor group had originally put into the corporation or the LLC. I forget what it was. Isn't that correct? Your Honor, I would differ in this sense. The Taylor group made several different claims. And my point is that what business did the Bankruptcy Court have in adjudicating a property right which the debtor never claimed that it had? But wait a minute. Wait a minute. That's not the way Bankruptcy Courts work, counsel. Whatever property the debtor has, whether claimed or not, is part of the bankruptcy. And in this particular case, the entity thrown into bankruptcy was from at least the Taylor group was involved in a settlement. Certain assets were conveyed there, at least based upon the language of the settlement agreement, based upon what was said. I don't know of any reason why the Bankruptcy Court would have questioned that everything that the Taylor group purportedly had went in there. Why am I missing something? Well, because, Your Honor, first of all, I don't believe that there was a settlement agreement. Where I disagree with the Court slightly is that I don't believe there's evidence that the Taylor group had entered into any settlement with anybody in which the Taylor group had conveyed or transfer or otherwise. But that's not what the Bankruptcy Court said. Step back, then, because what you're actually saying is there's a carve-out, in effect, for this stationary application technology, either a carve-out or it never was in the pot. So I'm starting. Let's move to the September 11th agreement. Sure. And if you look at the terms of the agreement, it basically says all the technologies, you know, now, future, whatever, everything's in the basket of conveyed rights. Why isn't stationary application technology among the plural of technologies used in the agreement? Actually, Your Honor, if I may, first of all, we're — what our contention is that the stationary technology was within the But not the other three. The other three. Right. The other three. Now — And now why would they be outside? I mean, there is that later agreement on stationary application technology. Where does it say here, but not these three? Because the letter agreement, by Axion's own evidence, the letter agreement had been, of course, notified by C&T. And remember, Your Honor, the letter agreement was between an entity, MCT, Mega-C Technology. Now, there is — Mega-C Technology acquired its rights, whatever rights it might or might not have had, and there's a dispute over that, through the initial joint venture agreement with C&T. And that joint venture agreement, as Mr. Kaczynski made very clear in his declaration, that's the declaration that, one, Axion submitted, and, two, the bankruptcy court relied on almost exclusively. That declaration made it very clear that the initial joint venture agreement talked only about the stationary application, which is only 10 percent of the overall value of the technology. Are you talking about the association agreement? No. Are you talking about the joint venture agreement? I'm talking about — well, House, Your Honor, if I may. Yeah, because talk about the precise document and which reference in the record, because you have lots of companies that sound the same, and you have oral agreement, written agreement, association agreement, joint venture agreement. So we have to actually be quite precise. I could not agree with the Court more. If I may, Your Honor. First, in time, there was the joint venture agreement by which MCT — and I agree with the Court. Too many Mega-Cs are running amok. But he does the math. MCT — Right. Mega-C Technology, which was not the debtor, that, through the joint venture agreement, MCT acquired the stationary application — a license, quite frankly, for the stationary application. Now, how do we know that's true? It's not what the Taylor family contend. It is in the Kuczynski — I can never say the gentleman's name properly — the K — the Kuczynski declaration. He made it very clear that, look, in this joint venture agreement, the starting point of everything, MCT — not the Taylor family — MCT acquired only the stationary rights. Okay. Then the second — okay. Then the second agreement was the letter agreement by which MCT, not the Taylor group, not the individual Taylor group — and remember, the Taylor group, in their Canadian lawsuit, alleged not so much that — not just that MCT had rights, but they, independent of MCT, had the rights to the remaining 92 — or, actually, one-third interest in the remaining three applications. So what do you contend MCT that is in the September 11 letter agreement is the same MCT you're referring to? Yes. Okay. Just to be clear. So what did they acquire there? Okay. So what MCT acquired by the September 11 agreement is the right to license the stationary application only. And Mr. Kuczynski's declaration makes that very, very clear. But wasn't that license terminated for nonpayment? Absolutely, Your Honor. So there's a question. There's a very legitimate question. There's a question the agreement terminates. And if it terminates, then it's as if it never had the license in the first place for purposes of the bankruptcy, right? Absolutely, Your Honor. Now, then to get into — but chronologically, what happened next is that C&T, through its legal counsel, Mr. Kuczynski, said, wait a minute, we don't even recognize the right of MCT or this letter agreement of September 11, 2001 because we actually had the controlling board and we were not part of this agreement. So hence the reason for the termination. And what C&T came back with is, okay, we want to do a new agreement in which we would participate fully, and hence the association agreement, which made very clear, both in this term as well as in the Kuczynski declaration, the association agreement gave only a licensing right, again, only to the stationary application. Okay. Now, and that agreement, of course, was subsequently terminated for nonperformance as well. So what we have at the end of all this, Your Honors, is the fact that the debtor, Mega C. Power, as opposed to Mega C. Tech, had absolutely nothing by definition because of what Axion submitted to the Bankruptcy Court. And there was no evidence to the contrary. So what we have, Your Honors, is a situation in which the Bankruptcy Court and the BAP had nothing in the record that indicates the debtor, one, had any interest ever, ever in anything but the stationary application. And, two, whatever interest it might have had in the stationary application had been terminated before bankruptcy so that the debtor actually had absolutely nothing. But, Counsel, with respect, you are correct about one thing for sure, and that is this is a very complex arrangement among entities and folks. But if there's anything that's clear about this bankruptcy, it is that all of you were in the pot together. You were all arguing your positions before the bankruptcy judge. Everybody made claims. The claim that you made was made in the Bankruptcy Court, if I understand correctly. The bankruptcy judge took all the evidence together, took the evidence of Chip Taylor, took the evidence of the documents, took the evidence of the settlement agreement, the association agreement, the representation of the parties made in connection with the summary judgment, and concluded, as it did, that, in fact, your parties were just out of luck and there was an injunction enjoining you from moving forward in Canada or elsewhere. He particularly referred to Section 10.5 of the Release Agreement, which is a rather broad, sweeping release in making the ultimate conclusion. I respect your point about this alleged vacuum of things, but you would have to agree, I think, that at the very least, your point was contradicted. The bankruptcy judge had contrary evidence from its perspective, and it concluded differently. Do you agree with that? Your Honor, here's what I will agree with. That certainly, I'm sure the Bankruptcy Court somehow believed that. But thank goodness we don't have to look at what the Bankruptcy Court subjectively determined. What we can look at is the record, and the record, Your Honor, is clear. Well, I don't think there's anything clear about this case. But the key here for us as a court on appeal is we have to find out whether there was substantial evidence that backed up what the bankruptcy judge concluded and what the BAPT affirmed. And what I'm hearing you say is, hey, you know, the bankruptcy judge dismissed it because the issue, what we're talking about simply wasn't before the bankruptcy judge. The bankruptcy judge just got it wrong. Isn't that correct? Well, Your Honor, yes, but it goes further than that. What's interesting is that the Axion appellees have, you know, of course, are represented by very capable counsel, wonderful pleadings. However, what's missing is that they cannot rebut anything that I'm saying here, which is that the evidence is, in fact, Axion itself took the position many times that the debtor had absolutely no interest. Okay, and we're in the record. Let's get specific about that. What in the record do you cite that buttresses the point you're making before our court this morning? Sure, Your Honor. If we look at – I can – let me start with AER 982 through 98 – oh, excuse me. Bear with me, Your Honors. 98 – 990, the Kishinevsky Declaration. Okay. If we look at – And the Court had that. Yes. The Court had that. Yes. And that's the – and that's why we're here on appeal, Your Honors, is that we don't need to ask the Court to reweigh the evidence. That's the beauty of this particular appeal. We don't need to say our evidence is – should have been given more consideration. We understand, Your Honors, that that's not your job. Your job is to look at the record, and the record is, from our perspective, beautiful. I wouldn't change a thing in this record because, quite frankly, I would have submitted the Kishinevsky Declaration because, insofar as on this particular issue, whether or not the debtor ever, ever had any interest or even claimed to have had any interest when it mattered, not after the fact. Your position is that there are no material disputed facts in the record? None whatsoever, Your Honor, which is why – And that you, not the Axion group, were entitled to summary judgment? Absolutely, Your Honor. And certainly, conversely, they were not entitled to summary judgment. Again, I would – Well, they also moved, right? I'm sorry. They also moved. I'm sorry. Both sides moved for summary judgment? Yes. In the adversary proceedings? Yes. So you were both saying there are no material facts in dispute. Axion says, I'm entitled to judgment as a matter of law. You say, no, we are entitled to judgment as a matter of law, correct? Yes, Your Honor. And if I may add, I think one of the problems is that the Bankruptcy Court took it upon itself to adjudicate an issue that it really, one, did not have to adjudicate and, more importantly, had no reason to adjudicate or authority to adjudicate, which is the existence of the oral agreement or the lack of the oral agreement between the Taylor group, not – and not the debtor, but Axion and C&T. That is to say that that question has relevance only if the debtor even claimed that it had any right to the nonstationary applications that the lawsuit in Canada was about. Can I just step back, sir? Sure. To sustain your position, the documentary TREA would have to start with the stationary application technology and move it through all the agreements, and that would be the only technology that moves through the agreements. That's your position? Your Honor said it much better than I have for the last 15 minutes. Yes. Okay. And the beauty of that is that, by definition, what was not moved through all these agreements and these wiggles and squids and whatnot, turds and turns, is the not – is the other three nonstationary applications. And that's what the Canadian lawsuit was about, the Taylor group fighting between they, on the one hand, and the Axion's predecessor, C&T. Notice that the debtor is not in that equation at all. So that's a fight that did not belong in the bankruptcy court. And for the bankruptcy court to make a ruling that there was – that such an oral agreement did or did not exist had simply no place in that. Well, let's just take that out of the equation. Sure. You also made the statement that the bankruptcy court wouldn't really need to adjudicate this issue, but I don't see how it could decide, you know, the injunction and the scope of the release in its own order without knowing what it's talking about. In other words, what is the underlying pot of rights that are coming in or out? I don't – so I don't quite understand your statement on that. And, Your Honor, maybe the better way for me to say it is to say that what the bankruptcy court had in front of it was clear, that the most compelling evidence is the Kuczynski declaration, which made it very clear. It told the bankruptcy court, Your Honor, the debtor never had any rights to anything other than a claim, a possible claim to the stationary application. And even that, we believe, Mr. Kuczynski and C&T said, we believe that has been terminated. But regardless of if it terminated or not, whatever the debtor ever had claimed to had nothing to do with the Canadian lawsuit between the Taylor Group on the one hand and C&T on the other. And I just realized that I'm almost at 18 minutes. So – but I'm happy, of course, to entertain more questions, because I do agree with the Court. This is a fascinating, complicated case, except that for once, I have a beautiful record. I stand on that record. And that's why. I think we all have been in it a little longer than we have, but we want to make sure we get all the megas correct. So why don't have you sit down and you'll have an opportunity for rebuttal. Thank you for your patience. I appreciate it. Good morning, Your Honor. Saskia Leone on behalf of the applicable cross-appellants. And may I inquire, may I reserve time since I'm a cross-appellee, or does the Court not permit that? You know, I think that we're going to be a little flexible with everybody, so I think it's best to just argue, since you're second, just argue everything. Okay. Okay? Thank you very much, Your Honor. There are a number of inaccuracies in what Your Honors have just heard that I need to debunk, and they're very easy to do. What the Court needs to look at, I think, in order to understand this case and understand exactly what it was that was in front of Judge Seib when he granted summary judgment in favor of my clients, is precisely the Kishinevsky Declaration. That is located at Axiom Record 2081 and proceeding therefrom. What is very significant about this declaration is that it does not say what the appellants say that it says. The declaration does not adjudicate who has rights to what. What Mr. Kishinevsky says is that he was the lawyer for C&T and that this is the train of events that led through these three agreements that ultimately came in front of bankruptcy court. And what Mr. Kishinevsky says is we took the position, C&T took the position, that by virtue of not being a party to the letter agreement and various notices of default that were issued by all of the parties to the agreement of association, that the agreements then were and C&T believed it solely owned the technology, all rights to the technology as the original inventor of the technology. What is very significant about this is two critical facts. First of all, and I'm very pleased to hear Counsel say this, that he endorses this declaration because this declaration also contains the fundamental evidence that Judge Seib had in which he concluded that there was no moral agreement. Because if you look at paragraph 12 of that agreement, it says, and I quote, this is located in Axiom 2086, the joint venture agreement, the amendments to the joint venture agreement of the agreement of association are the only agreements that C&T ever signed with Chip Taylor & Trust, MCT, which is Megacity Tech, or Megacity, which is the debtor. There have been no amendments to NMUP foregoing agreements. Any allegations that Megacity, the debtor, Megacity Tech, or Chip Taylor & Trust have any ownership rights in or otherwise to the E3 supercell technology that go beyond four quarters of the executed contracts is baseless. This was the evidence that Judge Seib had that led him to conclude this whole concept of there having been an oral agreement is fabricated. It was made out of whole cloth. So from your perspective, Mr. Kedzianinski, or however you pronounce it, was basically saying you've got a, everything's in the contracts, there's nothing else in the contracts, and so you can't go beyond it, there's nothing there, you don't get into parole evidence at all. Exactly. Is that right? Yeah, basically that's it. But there were a couple of other things, too, that were very significant about this. Mr. Kedzianinski does not testify that the debtor had no interest. Kedzianinski instead says, these were the agreements, we thought they were terminated, we believe C&T owned the technology as of August of 2003. So he didn't say they don't have anything. Correct. He just said whatever there is is discussed in the agreements, that's it. Exactly. Do I understand correctly that C&T formed Axion? No, that is not correct. Axion was. Tell me the relationship between C&T and Axion. C&T and Axion, which was formed by individuals who had been investors in the debtor. And the debtor was essentially a fraudulent scheme to raise money, and that's a whole other subtext of this case that the Taylors are a part of. You're not going to tell us that MF Global is involved in this, are you? C&T, Your Honor, was the developer of the technology. Axion Ontario purchased the technology directly from C&T. Axion Ontario then merged into an American company called Tamburil Cigar Company. Tamburil was a publicly traded company and then changed its name to Axion Power International, which is the main appellate. So the correct way to say it is the Axion American Corporation acquired all of the interest in the technology. Correct. From C&T. Directly from C&T. And the Coach K Declaration says that. No. He goes through the purchase of the technology. I don't think that he really goes into much of the background of Axion and how it came into being. Okay. But regardless, the critical thing with respect to this, Your Honor, is that when Judge Zive approved both the settlement agreement and the plan of reorganization, the settlement agreement resolved all of the competing claims between the debtor, through its Chapter 11 trustee, and Axion as to who owns something in the technology. And that's that paragraph 10.5 to which I made reference earlier. Those are the releases. Those are the releases, yeah. That were originally contained in the settlement agreement and then subsequently were contained in the plan. And then right before that is the plan injunction, which, of course, operates to my client's benefit. But the critical thing about this is that if you look at the plan itself, the plan defines disputes in paragraph 1.1.42, and it says we are resolving all of the disputes, including the technology disputes, and those are also defined terms in the settlement agreement. The settlement agreement, of course, included all of the various allegations that had gone back and forth as to whether or not my clients had received a fraudulent conveyance, et cetera, et cetera. All of this is resolved through the plan. So to say that the judge never decided what the debtor owned, the judge never could have decided what the debtor owned for this reason. The plan said those issues are not being resolved. Whatever it is that the debtor does own is being transferred to Axion. That was the conveyance through the plan. Now, how does that connect into what you've heard this morning from the appellants? A very, very critical point. With respect to the letter agreement, which I believe, Judge Smith, you said, oh, it looks like this was terminated so it couldn't convey any rights. I respectfully disagree with that, and let me explain to you why. And this was also something that was in front of Judge Seib. It was very critical, and it was completely undisputed. Undisputed. The point is that early on in the case, the tailors, including Chip Taylor as an individual, Chip Taylor and Trust, and Elgin Investments, all filed proofs of claim. And the evidence that was in front of Judge Seib at the first summary judgment hearing was not just the Kishinevsky Declaration, although that was very critical, and I recommend it highly because it's a very, very important document in this case. The other evidence was testimony that was given by both Chip Taylor and Skip Taylor, his sons, in which they testified about the basis of these three proofs of claim. And the undisputed evidence in this record, not just in the summary judgment hearing, but in the three motions to set aside the summary judgment initially, and then the fourth motion to set aside the summary judgment for fraud based on the Kishinevsky Declaration. I'll get back to that in a minute. But the critical point that Judge Seib had in front of him in the summary judgment hearing was that these three proofs of claim were filed against the debtor, although there was no direct contractual relationship with the debtor, arising out of mega C tax rights in the technology. So what does that mean? What that means, of course, is that the letter agreement may very well have been terminated. That does not mean it is not in existence, and it doesn't mean it didn't convey rights. Let me give you an example. A more run-of-the-mill case, a debtor contracts either in writing or orally with Corporation X to supply widgets. The corporation delivers the widgets, the debtor takes the widgets and does something with them, and then 30 days later doesn't, 90 days later, let's pick a longer period, doesn't pay for them but files for bankruptcy. What does the debtor have? The debtor still has possession of, if it hasn't sold those widgets, it still has rights in those widgets and could dispose of them through a plan. What does Corporation X have? It's not a party to an executory contract, which is another one of the new arguments that we're hearing in this appeal. The executory nature of the agreement is utterly irrelevant because what the Corporation X has is a claim against the debtor, because it gave consideration and hence is entitled to be repaid. Let me see if I understand the big picture here. Okay. The bankruptcy court had an adversary proceeding which was filed by the opposing party, right? I filed the adversary. You filed the adversary. On behalf of my client. Well, I had in front of it completing, competing claims as to the ownership of the technology. Incorrect, Your Honor. No. The claims to the technology were not at issue in this adversary and were not any longer at issue in the bankruptcy case because of the way the plan was written. The plan was written whereby whatever it was that the debtor owned in the technology was transferred to my clients. That has taken place. In addition to that, the tailors claimed that they had some amorphous rights, this oral agreement, quote, unquote, that gave them rights to the technology. And my clients took the position that, number one, there never was an oral agreement. And even if there had been, the tailors had transferred that right through the letter agreement and legacy tech to the debtor because otherwise there would have been no basis for the tailors to have filed proofs of claim against the debtor. So if we affirm the bankruptcy appellate panel, who owns the technology? My client. Axion. Axion. Absolutely. The American company. That is correct. And that's the result of the competing motions for summary judgment in which the claim that there was an oral or implied or other agreement didn't exist. Correct. That they had the burden of proof to establish those agreements and they failed to do so. That is correct, Your Honor. Okay. This is an odd composition to say, well, they have whatever they have, but now we own it all and we own all of this. So there is a little bit, as I understood the family's argument, is that it depends on where you start with these agreements. Now, forgetting the oral agreement because the court quite clearly said that the declaration was not plausible and it was inconsistent with the documentary and testimonial evidence. So leaving that aside, would you respond to the argument that at the outset the only technology that was being discussed was the stationary application technology? I will, Your Honor. And I think basically in my presentation so far this morning, I essentially am getting to exactly that point. The bankruptcy court didn't. Now would be a good time. Okay. Let me make sure that this is very clear because I think that it is very important. And I also don't want to lose sight of another point that is, I think, critical for Your Honors to understand. The bankruptcy court had at least three bases for granting summary judgment. The existence or nonexistence of the oral agreement was only one of them. The transfer of rights to the debtor through the letter agreement was a second, and the lack of consideration for an oral agreement was the third. The third, the lack of consideration is not even raised by the appellants at all. Okay. So the answer to your question, I want to make sure I understand your question, Your Honor, to make sure I'm addressing what your concern is, is how is it that the bankruptcy court addressed these four different applications to the technology and whether or not the debtor owned something or did not own something in the technology, period. I think that the way that the bankruptcy court addressed that was by admitting into evidence the Kishinevsky Declaration and concluding that by virtue of the proofs of claim that the three members of the table group had filed, that they testified were filed on the basis of the letter agreement, only the letter agreement, not the subsequent agreement of association, that based on that there had to have been consideration that flowed from those three claims, those three appellants, to the debtor. And that consideration would have included whatever rights it was that they had in the technology. And what he based that on was the actual language of the letter agreement itself. And I'm going to point you to Axiom 2204, paragraph 2 of that agreement. The date of the agreement is significant, not merely because of the historic date from our country's perspective, but also because it postdates the allegation in the Taylor v. Tamriel litigation that the oral agreement came into existence. Let me just stop you just for one second, because I'm following what you're saying, but it seems a little contradictory and I want you to help me out here. What I understood you to say just a few moments ago was that what the bankruptcy court did not have the technology that they're referring to before it, because that had previously been conferred to your clients. Is that correct? We believe that it had, Your Honor, by virtue of the Kishinevsky Declaration, which said these people never had rights to it to begin with. But the reality is, from your perspective, at the end of this litigation, whenever that might be, God willing, that you're going to have those rights by virtue of what the K Declaration talked about, not because of the bankruptcy court. Then on the other hand, I'm hearing you say that the bankruptcy court had these proof of claims from the Taylors and reasoned that if they didn't have anything at stake here in terms of the technology, there would be no consideration. They would have no basis for making a proof of claim. All right. So these are these are internally inconsistent. And on the one hand, you're saying there wasn't anything in there in terms of technology. You had it outside. They're claiming there was something inside. But even however it works out, whatever they allegedly had, the bankruptcy court disposed of it and made certain it was transferred to Axion. All right. Yes. And let me let me make that link, Your Honor, which was exactly where I was going. Okay. Axion 304 and 306 contains the allegations from Taylor v. Tam Grill regarding the oral agreement and when it came into existence and what the consideration was. It was August or thereabouts of 2003. Excuse me, 2001. September 11, 2001, Megacy Technologies and Megacy Power signed a letter of agreement. In that paragraph two, Megacy Technologies, and I'm quoting, hereby grants to Megacy Power Corporation exclusive worldwide unlimited rights for the commercialization, et cetera, et cetera, of the technology's own controlled license and or development developed currently in place or in the future by Megacy Technologies. So Megacy Tech, whatever it was that they owned, transferred that to the debtor. And the link to the claims is that if the three claimants asserted that their rights to money from the debtor arose out of this letter of agreement, they had to have been given consideration, and the consideration would have been whatever their rights were in the technology, which would have included the oral agreement. I guess I'm having some trouble with that link, because one question about the technologies is, well, what are they talking about? It's what is owned, controlled, and licensed by Megacy Technologies. So it's a bit circular. So the question is, well, what is it? I mean, where does Megacy Technologies get the technology from CT? Megacy originally got its own license to the technology from C&T through the joint venture agreement. Right. And then the joint venture agreement. What is the scope of the technology? Just the stationary. But the problem is, Your Honor, the problem is that there's this allegation that the tailors received some additional rights. Okay. So let me just stop right there. So CT is the original developer. Correct. Then we have the joint venture agreement, which applies just to the stationary technology. Correct. And then the next agreement, and that goes to Megacy Tech. Correct. Correct. And then the next written agreement. Is the letter agreement. Is the letter agreement, and Megacy Tech gives what it has. To the debtor. To the debtor up here, but what it got was only the stationary technology, right? In writing. In writing. In writing. But they allege later, no, we also had this oral agreement. And the oral agreement was to the three individuals who filed the 3,000-point claim. If all that Megacy Tech had as of September 11th was stationary technology, then that's all it was transferring to Megacy? Correct. If that's all it's had. If that's all it had. And then that's what Megacy gives over to Axion. Correct. Whatever those rights were, whatever those little rights were. Okay, so tell me again, what intervenes from the time Megacy Technologies gets only the stationary rights? What intervenes to give them a bigger bundle of rights? The oral agreement. The so-called oral agreement. And we all know, of course, if you're a party to a contract, you would have the right to sue on that contract. But if you're not, you would have no rights. These three claimants claim to have rights under this contract. And the only basis on which they could do so is if, in fact, they were also having transferred their rights in the oral agreement. But, see, that doesn't make sense to me that you impute that. I mean, just like you say, well, just because you made a claim, you must have a right. I mean, that's where I'm missing something. Well, they made a fraudulent claim. Well, that's a possibility, but that wasn't. That is. And see, the problem. And was that adjudicated? No, it was not. And see, that's the problem, Your Honor. That is the problem. That is the problem, because there's no evidence from the other side. So my position with respect to it, the argument that I made, was never refuted. They didn't even address it in opposing the summary judgment. They didn't address it in their first three motions for relief from the summary judgment. Can I just stop for a second? This is what's bothering me, and maybe you can help me get to the bottom of it. Because the summary judgments, of course, are looked at de novo and what's in the record. So what I see in the record is that Mega-C, by the time it gets to September 11th, the only thing it has in writing relates to the stationary application technology, correct? Correct. And then it gives it to Mega-Power, and Mega-Power then gives it over to your client. Through a plan. Through the plan, correct. Whatever those rights were. But not whatever those rights were. Well, they have to be defined in some way, because at the end of the day, you want to end up with all the rights, not just whatever the rights were. You basically say we've got all the rights, the bundle of rights and the entire technology. And I think that that's what the summary judgment order gives my mind. Well, I know it does. The question is whether it's correct. And the link that's still missing to me is how the documentary evidence of stationary application technology, which is the only thing, the only paper trail, how that then turns into all technology. Well, as I've said now, I think what I'm trying to convey to Your Honor is the record that was in front of Judge Zeig and the existence of those proofs of claim out of which. Okay. So does it boil down to what you make of the proofs of claim as somehow overriding the written agreement? No, it does not. It's the total sum of the record, and the total sum of the record, Your Honor, was not just the fact that these three individuals had filed proofs of claim. It was the repeated representation that all of them made to the bankruptcy court for years that Axion had stolen that debtors' interest in the technology. Today, you're hearing these same people say that the debtor had nothing. Well, that is absolutely not what they told the bankruptcy court for years. And then, only when their depositions were taken in 2007, did they finally testify that they, that Megacitec, the company that the takers owned and controlled, that by that point in time, they, Megacitec, had terminated the agreement of association, the superseded agreement to the letter agreement, for the purpose of taking the debtors' license back. So what Judge Sive is looking at is not just this one agreement, not just the letter agreement. It's not just the inconsistencies caused by the proofs of claim that were filed by Chip Taylor, Chip Taylor & Trust, and Elgin. It was their overwhelming conduct in front of the bankruptcy court that led the judge to realize the only way to reconcile all of this is that there had to be something to reconcile. Now it sounds like somebody's weighing the facts to reconcile all that. There's no weighing, Your Honor, because there was no, there were no competing facts. The first summary judgment motion, the next three motions for reconsideration contain zero facts. The evidence that is in the record is either documents that the Taylors themselves filed in the bankruptcy case, and those are all part of the record that I provided to you, and they are cited in detail in my opening brief. It's either the documents that they themselves filed, the proofs of claim, the Kishinevsky Declaration, and their subsequent testimony. That's what the bankruptcy judge had. Did the bankruptcy trial court, Judge Sive, conclude as part of granting your client summary judgment that the oral agreement, these three individuals, had resulted in transfer of all of the technology to your client? I think that the way that it is phrased in the findings of fact and conclusions of law, Your Honor, is that he found that there was no evidence of the oral agreement as a result of which all of whatever it was that the debtor owned in the technology was transferred to my clients. And as a result of that, there were no further claims left in Taylor v. Tamarill except for the derivative claims, and those were properly released and enjoined by virtue of the plan. Can I just step back here for a minute? What I'm gathering from your presentation here is that you start with the fact that your client had these rights before the bankruptcy was ever filed, right? Correct. Okay. That was always our position. Right. Okay. So then you have the Taylors through themselves and other entities making claims in the bankruptcy that it or its entities had these rights. The bankruptcy judge heard what they said, saw the documents and so on, and said, whatever, he didn't even talk about what happened before, but whatever happened before is not before me, but whatever rights these folks have are before me. And based upon that, I conclude they have no rights. Correct. And therefore, I'm enjoining them from proceeding to claim any rights on their part anywhere else. Is that correct? That is correct. And there's never been any contest that that was a proper use of the injunctive power of the bankruptcy. So let's assume, just for discussion purposes, were we to affirm the back, then where does your client lie as far as its rights in this? What you would just say is we had it before, but whatever happened before, we sure have it now because the bankruptcy court has given us whatever claims that it has disputed and done away with any claims that the Taylors have. Let me make sure that the court understands what my client's position has been. Can you answer the judge's question? Yes. The yes or no? It is exactly a yes, and that's what I want to make sure that I explain to you. My client has always taken the position that it is the sole owner of the technology once it bought it from C&T. So it could, if there were another party not part of this that wanted to license the technology from your client, you would have no difficulty signing representations and warranties that you had all the rights and, you know, benefits from that. There was no contrary claim, et cetera, right? That is correct. Okay. And that the only claim they have is derivative of this basket of rights out of the bankruptcy court, so there can't be some independent claim in Canada, correct? Correct. And by virtue of the rights they directly got from the owner of the technology to begin with.  So they have a dual bubble. Are there any other questions? No. We've far exceeded the time. So we're eight minutes over, but that's because we've had a lot of questions. I apologize for that. No, it's no apology needed. It's a case that we want to make sure that we understand completely from both sides. So thank you for your argument. I appreciate that, Your Honor. Will I have any opportunity to discuss my cross appeal? We'll look at that on the briefs. I think it's well briefed. Thank you. We, let's see, you have two minutes left. Why don't we give him four minutes of rebuttal time since we were generous with his opposing counsel as well. Thank you, Your Honor. And the Court had it absolutely right. There is a missing link. It has to do with the fact that the oral agreement, as alleged in the Canadian lawsuit, was on the one hand between the Taylor family and on the other hand, C&T. It had nothing to do with MCT. The MCT was not part of the agreement. So what the missing link is that the Taylor family, there is no evidence whatsoever that the Taylor family had transferred whatever it might have acquired through the oral agreement to MCT. There is absolutely no evidence of that. Your Honor, I'm a simple person. All this, you know. The counsel, neither you nor your opposing counsel are simple. Neither is this case simple. How is this, Your Honor? I like to make things simple. How is that, Your Honor? Okay. Let's not talk about stationary, recuperative, mobile. Let's talk about potatoes. Let's substitute potatoes for stationary application. And we substitute all the non-stationary. Let's just call that computers. The Taylors thought they had an oral agreement to acquire computers from C&T. Well, the bankruptcy court pretty well shot that out of the water, didn't it? But my point is, let's ask ourselves, why? Why would the bankruptcy court even have any business in determining the fight over computers when, in fact, the only evidence is that the debtor might have acquired potatoes, not computers, through the letter agreement or the association agreement? But your client claimed before the bankruptcy court that it had all of the rights to the potatoes and the computers. And the bankruptcy judge decided to the contrary. No, Your Honor, if I may. I believe that what my clients, the reason why they fought on the summary judgment motion, they opposed the summary judgment motion on the basis that our Canadian lawsuit over computers, not potatoes, with a non-debtor, with a non-debtor, C&T, had nothing to do with the bankruptcy. But it was the derivative, and that was discussed, right? Your Honor, but the interesting thing, it is not derivative. It is derivative only if we can find something in the record to show that the debtors had, the debtors had acquired arguably potatoes at some point. There's no evidence that the debtor ever acquired anything in the computers at all. But the bankruptcy court, and this is correct, didn't the bankruptcy court conclude that whether your client claimed potatoes or computers, that those rights were now terminated? Everything belonged to Axiom. But, Your Honor, but I think my able opposing counsel put it best. What the plan did was it resolved, and I believe I'm quoting her, quoting the bankruptcy court, the plan resolved whatever the debtor owned in the technology. Now, if the only evidence, the only evidence is that the debtor only owned the potato part of the technology and not the computer part of the technology, then the fight over the computer part of the technology should be, should not be enjoined in Canada. It should be. But I think what she said is, or at least as referenced in the bankruptcy decision, is that by filing the cursive claim, which were based on the letter agreement, that when you take that in the constellation of all the other evidence, that that's why the bankruptcy court felt that your client was making a claim to technology that was already in the pot. And if it wasn't, then it would have been filing a fraudulent claim. So it's like one or the other. No, Your Honor. My clients were filing a claim in the bankruptcy court for potatoes, for potatoes, which ultimately they lost because it was, potatoes would have been derivative. Potatoes, derivative. Computers, non-derivative. Canadian lawsuit, computers. What was the phrasing of their claim? I, Your Honor, I honestly do not know as I stand here what exactly. It's in the record, of course. However, however, the, but that's not, but there has never been a finding that the Taylors claim that through their bankruptcy claim that they wanted to litigate the existence or the non-existence of the computers part of the claim. Counsel, this is what strikes me as. Your opposing counsel likewise so characterized it. It seems to me from reviewing the record that your client has changed position as to what it owns and what was before the bankruptcy court. Is that a fair characterization? I do not believe it is, Your Honor, because part of the problem is that, see, this is why I kind of jokingly have broken this down to potatoes versus computers. When we see, I think what Exxon has done is done a masterful job of meshing everything under the one umbrella of technology. You think it's mashed potatoes? I bow to the court's hearing. But, Your Honor, but the point is that, but the analytical point is that it's not just technology.  My clients fought in the bankruptcy court as they should for the potatoes because there is, there was an issue as to whether or not the debtor had rights to even the potatoes. But there was no issue whatsoever that the debtor, through the Krishnansky Declaration, and, again, I would urge the Court to review that declaration. If you substitute in the word potato for stationary application, you will see that C&T, which originally owned the technology, said that, look, the letter agreement, the association agreement, the joint venture agreement, all those things talk only about potatoes, not computers. Okay. I think you're to the end of your time. Just answer one question. Sure. Are you suggesting there's a material issue of fact or that summary judgment should have been granted for your client? I believe that, Your Honor, that at the very least, summary judgment should not have been granted because the only evidence that was available before the bankruptcy court and the BAP show that the debtor never even claimed, and there's no evidence that the debtor ever claimed to have any interest in anything other than potatoes, and the Canadian lawsuit was about computers. Thank you very much for your time and patience. Thank you. Thank you to both counsel for your very extensive and helpful arguments this morning. The case just argued, Megacy Power Corporation v. Axion Power is submitted. And we're adjourned for the morning. You want to submit the rest of those? The others are submitted on the briefs by the clerk already, I believe. Thank you.  Okay.
judges: Hawkins, McKeown, Smith